**IN THE MATTER OF ARBITRATION BETWEEN**

**DYNAMIC ENERGY, INC., COAL MOUNTAIN
NO. 1 SURFACE MINE,**

**CASE NO. 07-10-048**

      **EMPLOYER,**

**DECIDED: JUNE 27, 2010**

**And**

**UNITED MINE WORKERS OF AMERICA,
DISTRICT 17, LOCAL UNION 8783,**

      **UNION.**

_____/

**Union Representatives:**
Jerry A. Massie, Dist. 17, Field Rep.
Joseph M. Carter, Jr., International VP
Ben Clary, Local 8783 Rep. and Grievant

**Employer Representatives:**
Kenneth R. Eller, Consultant
Rodney Hamilton, Mechel HR Dir.
Pat Graham, Mechel HR GM
Billy Bob Marcum, Employer GM

## DECISION AND AWARD

### INTRODUCTION

Dynamic Energy, Inc. (hereafter "Employer"), the operator of a surface mine near Coal Mountain, West Virginia, and United Mine Workers of America, District 17, Local 8783 (hereafter Union") are signatories to the National Bituminous Coal Wage Agreement, as modified by a Memorandum of Understanding effective January 1, 2007 ("hereafter "Contract" or "NBCWA"). On February 2, 2010 , Union representative Ben Clary (hereafter "Grievant") filed a class grievance on behalf of adversely affected employees (hereafter "Grievance") claiming the employer

1

contracted out the processing of its coal in violation of the Contract. After the parties exhausted the Contract's grievance procedure without reaching a mutually agreeable resolution of the Grievance, the Union submitted it to arbitration. The undersigned (hereafter "Arbitrator") was appointed to hear and decide the Grievance. An evidentiary hearing was held in Beckley, West Virginia, on May 6, 2010, at which the parties were afforded a full and fair opportunity to present their evidence and cross-examine each other's witnesses. Subsequently, the parties submitted closing briefs and a wealth of industry arbitration decisions supporting their respective positions.

## GRIEVANCE

The Grievance reads in relevant part as follows:

> Management is in violation of Article 1A section (a)
> ... of the NBCW of 2007. On or about 2/21/10/, un-
> classified personnel were observed working at a coal
> stockpile that has in the past under union work juris-
> diction. As a remedy we ask that any union member
> affected by this action be made whole, and that the
> company cease and desist from this practice.

## RELEVANT CONTRACT PROVISIONS

The following Contract provisions are, or may be, relevant to deciding the issue(s) raised by the Grievance:

### CONTRACT

#### ARTICLE I – ENABLING CLAUSE

.... It is agreed that at operations covered by this
Agreement the ... [Union] is ... recognized ... as the
exclusive bargaining agency representing the Em-
ployees....This provision does not change the rules

2

or practices of the Industry pertaining to manage-
ment. The Mine workers intend no intrusion upon
the rights of management as heretofore practiced
and understood.... Management will not abridge
the rights of the Employees as set forth in this
Agreement.

### ARTICLE IA – SCOPE AND COVERAGE

Section (a) Work Jurisdiction

The production of coal, including removal of overburden and
coal waste, preparation, processing and cleaning of coal and
transportation of coal ..., repair and maintenance work norm-
ally performed at the mine site or at a central shop of the Em-
ployer and maintenance of gob piles and mine roads, and work
of the type customarily related to all of the above shall be per-
formed by classified Employees of the Employer covered by and
in accordance with the terms of this Agreement. Contracting,
contracting leasing and subleasing, and construction work, as
defined herein, will be conducted in accordance with the prov-
isions of this Article. Nothing in this section will be construed to
diminish the jurisdiction, express or implied, of the... [Union].

***

Section (d) Management of the Mines

The management of the mine, the direction of the working force
and the right to hire and discharge is vested exclusively
in the Employer.

***

Section (g) Contracting and Subcontracting

[None of this section's provisions allowing an employer to
contact out of work within the Union's jurisdiction under
section (a) is applicable to subcontracting coal processing]

### ARTICLE XXIII – SETTLEMENT OF DISPUTES
***

3

Section (k) Prior agreement

....Decisions reached under this provision shall be final and
binding. All decisions of the Arbitration Review Board rend-
ered prior to the expiration of the National Bituminous Coal
Wage Agreement of 1978 shall continue to have precedential
effect under this Agreement to the extent that the basis for such
decisions have not been modified by subsequent changes in this
Agreement.

MEMORANDUM OF UNDERSTANDING

The following provisions of the 2007 MOU are, or may be, relevant
and material to the issues in this case:

***

1. The terms and conditions of the NBCWA of 2007 and this
Memorandum of Understanding shall be retroactive to January
1, 2007.

***

6. The employer can contract the transportation of coal.
***

## FACTUAL BACKGROUND

In 2006, the Justice Family (hereafter "Family"), which at the time
owned, operated or controlled a number of corporations in West Virginia,
related to coal lands, mine construction, mining, transporting, processing,
selling and shipping coal. The Family incorporated at least the 17
corporations shown on the organizational chart introduced by the
Employer, and others not identified thereon, discussed below. In May 2009,
the 17 corporations and such others were acquired by Mechel-Bluestone
Corporation (hereafter "Mechel"). As of that time, Mechel stepped into the
Family's shoes at the top line of the chart.

On the second line are: Bluestone Industries, Inc. (hereafter "Blue
Stone"); the Employer; James C. Justice Companies, Inc (hereafter "Justice

4

Companies") and JCJ Coal Group, LLC (hereafter "JCJ Coal"). Of these corporations, only the Employer is signatory to the NBCWA. Although listed on the same line as Bluestone, its COO, Thomas Lusk, and the Employer's Mine Superintendant, Billy Bob Marcum, testified the Employer takes its directions on the amount and type of coal to extract from the Coal Mountain surface mine, how it should be processed and where it should be shipped from Bluestone, acting through Lusk. In this sense, Lusk, in his capacity as COO of Bluestone is also the COO of the Employer. In view of such testimony, it was inaccurate for the Employer to list itself on the same line as Bluestone, as if it, too, reported directly to the Family (now Mechel).

Instead of portraying the relationship between itself and Bluestone accurately, the Employer lists only the following corporations on the third line as reporting to Bluestone: Bluestone Coal Corporation (hereafter "Bluestone Coal"); Double-Bonus Coal Company (hereafter "Double Bonus"); Energy Plus, Inc. (hereafter "Energy"); James River Construction Company (hereafter "James River"); Keystone Services, Inc. (hereafter "Keystone") and National Resources, Inc. (hereafter "NRI"). Among them, the signatories to the NBCWA are Bluestone Coal, Double-Bonus and Keystone.

The chart is also inaccurate in several other respects. It lists the following corporations on a separate line, as reporting to the Justice Companies and JCJ Coal: Bluestone Coal Sales Corporation (hereafter "Bluestone Sales"); Justice Energy Company (hereafter "Justice Energy"); Justice High-Wall Mining, Inc. (hereafter "Justice High-Wall "); M&P Services, Inc. (hereafter "M&P"); Norfac Mining Company, Inc. (hereafter "Norfac"); Pay Car Mining, Inc. (hereafter "Pay Car"); and Frontier Coal Company (hereafter "Frontier"). Out of these seven (7) corporations, only Justice Energy is a signatory to the NBCWA.

However, it may reasonably inferred from the testimony of Lusk and the findings of Arbitrator Strongin in his case, based on the testimony of

5

the Employer's witnesses therein, that all of the corporations on such separate line report to Bluestone and receive their directions through Lusk. For example, Marcum and Lusk testified the Employer received its instructions on where to ship the processed coal from Bluestone Sales, a Family (now Mechel) owned corporation, also directed by Bluestone, through Lusk. To have been accurate, all of the corporations listed on such line should have been listed on the line reporting to Bluestone.

Another inaccuracy on the chart is the noticeable omission of the corporation to which the Employer contracted out the hauling of raw coal from the pit to the processing area (hereafter "Transport) and Black Bear Processing, Inc. (hereafter "Black Bear") from either the line appearing under Bluestone or the line appearing, inaccurately, under Justice Companies and JCJ Coal. This omission conceals the fact that Transport and Black Bear, like the other corporations on those lines, are owned or operated by the Family (now Mechel), report to Bluestone and also take their directions from Lusk.

This fact may reasonably inferred from the inconsistency of the Family contracting with an independent corporations to perform the transportation and processing components, when it was so assiduous in developing a structure consisting only of corporations it owned, operated and controlled, to perform each of the other component of its Coal Mountain mining enterprise, having each report to Bluestone, so Lusk can direct all of them. For Transport, the hauling component, and Black Bear, the processing component, to be independent corporations, not subject to such ownership and control would clash too drastically with such plan.

Finally, the Employer, through its advocate, inaccurately described Bluestone as the holding company for the other Family (now Mechel) owned corporations shown on the chart as reporting to it. If such corporations were owned by the Family (now Mechel), as the Employer's

6

advocate also represented (and which Lusk's testimony confirmed), by definition, the Family (now Mechel), not Bluestone is the holding company.

In terms of the Family's (now Mechel's) Coal Mountain enterprise, Bluestone serves as the overall management component and, through Lusk, controls the activities of all of the other component corporations, including, without limitation, the Employer (the extraction component), Transport (the on-site transportation component), Black Bear (the processing component) and Bluestone Sales (the sales component). In fact, Bluestone, through Lusk, also controls and directs the Family (now Mechel) owner corporations, M&P and Justice High Wall, to which Marcum testified Black Bear, contracted out the processing of the Employer's coal.

When the chart introduced by the Employer is redrawn to correct such inaccuracies, it shows Mechel, the holding company, on the first line; Bluestone on the second line reporting to Mechel; and all of the other corporations, plus Transport and Black Bear, on a third line reporting to Bluestone.

As evidenced by such redrawn chart, and the testimony of Lusk, unlike the structure of a typical coal mining enterprise, in which most, if not all, of the components are owned and operated by a single corporation, the Family (now Mechel) divides each mining enterprise into separate Family owned component-corporations (i.e., overall management in one corporation; extraction of raw coal in another; hauling of coal from the pit in another, processing and stockpiling such coal in another; and selling and shipping the processed coal in yet another. Further, the Family (now Mechel), through Bluestone and Lusk, uses one or more of such corporations (e.g., M&P and Justice High Wall) to provide contract labor to Black Bear to perform its processing contract with the Employer.

As Lusk testified, structuring each mining enterprise in this manner is designed to afford the enterprise, headed by Bluestone, the flexibility, in

7

the event of Union organization of one corporate component, to argue the NBCWA with that corporation cannot cover the employees working for any other non-signatory, component-corporations. There is no evidence in the record that such structure was intended to any other business purpose. It is reasonable to conclude the sole purpose of such a structure is to maximize the probability of limiting the application of the NBCWA to only the employees of any component corporation that is, or may become, a signatory to the NBCWA.

According to the facts found by Arbitrator's Strongin in his award, base on prior to 2008, the Family operated two other mining enterprises structured in the same manner: in one, Bluestone was the management component and Bluestone Coal, a signatory to the NBCWA, the mining component (hereafter "Bluestone Coal enterprise"); in the other, Bluestone was the management component and Red Fox, a non-signatory, the mining component (hereafter "Redfox" enterprise"). It is not clear from Arbitrator Strongin's statement of the facts in his decision whether, in those instances, the mining components of such other enterprises, Bluestone Coal and Redfox, contracted out the processing of their coal; but, if they did, it is reasonable to infer from Arbitrator Strongin's findings and Lusk's testimony in this case, it would be to another, non-signatory Family (now Mechel) owned corporation reporting to Bluestone.

It is this breaking down of the Family's (now Mechel's) mining enterprises into separate component-corporations and contending a collective bargaining agreement with one Union agreement cannot apply to the employees of the non-signatory, component corporations, which spawned, not only this Grievance, but two previous ones, in 2008 and 2009. It is important to understand the facts and rulings in the two prior cases, as the Employer contends they fall within the doctrine *res judicata*, as approved by the Arbitration Review Board (hereafter "Board") and, therefore, are binding on the Arbitrator in this case.

8

The more recent of the two was decided by Arbitrator Strongin in 2009. In that case, the issue  was whether, as claimed by the Union, using separate  Family (now Mechel) owned and controlled corporations, with Bluestone as the common management component, to  operate the Coal Mountain enterprise (in which the Employer, a signatory to the NBCWA, is the mining component), the Bluestone Coal enterprise (in which Bluestone Coal, also a signatory, was the mining component); and the Redfox enterprise (in which Redfox, a non-signatory, was the mining component) made all three enterprises and their respective corporate components a single employer for purposes of exercising panel rights under Article 17 (h) of the  NBCWA.

Arbitrator Strongin applied the doctrine of piercing - the – corporate-veil doctrine, which is more commonly used in determining whether two commonly owned corporations are jointly and severally liable for each other's financial debts or obligations, rather than the common or joint employer doctrine, specifically applicable in the labor and employment context including, without limitation, in determining whether a collective bargaining agreement signed by one employer covers the employees of the other as well.

In Arbitrator Strongin's case the Union presented evidence that various members of the Justice family owned and controlled the component-corporations of all three enterprises, Bluestone managed and controlled each enterprise, as well as each of its other component-corporations, the human, financial  and hard capital, such as equipment of each enterprise, as well as each of its component- corporations, were comingled, and the sole purpose of using such separate corporations as the components of such enterprises was to limit the coverage of the NBCWA to the employees of any component- corporation  which was, or might become, a signatory to such Agreement.

9

Arbitrator Strongin also acknowledged the binding decision of in ARB No. 56, a case with similar facts, in which the Board, upheld the extension of panel rights between two, nominally separate corporations, owned and controlled by the same family; and acknowledged that, based that decision and similar ones in other cases, the Board has generally eschewed such separate corporate forms in favor of "realistic" considerations of common ownership and control, when a family is claiming an "artificial separation." He also acknowledged panel arbitrator decisions in *Eastern Consolidated Coal Corp.*, No. 84-85-109 (Haber 1986) and *Dakota Indus., Inc.* (Buchanon 1983) to the same effect.

Nevertheless, Arbitrator Strongin gave short shrift to the results and rationales of such decisions, and rather than apply such realistic considerations, as is done under the common or joint employer doctrine, applying the artificial piercing-the-corporate-veil doctrine, concluded the Union failed to prove by a preponderance of the evidence the Justice Family (now Mechel) so disregarded the formalities of corporate separateness of the Employer, Bluestone Coal and Redfox as to cause them to be treated as a single employer for purposes of Article 17(h) of the NBCWA.

The other award dealing with the single employer issue was decided by Arbitrator Rimmel in 2008. The issue therein was whether employees of Transport, a non-signatory corporation owned by the Family (now Mechel), to which the Employer had contracted out the hauling of coal from the pit to the processing area in off-highway trucks, pursuant to a provision in the 2007 MOU, "[t]he Employer can contract the transportation of coal," also permitted such employees to load the raw coal into such trucks, a task that had been was performed exclusively by employees of the Employer for the 18 to 20 months immediately preceding the effective date of the MOU.

Union claimed it had jurisdiction over such loading work under Article IA (a) of the NBCWA, because "transportation", as used in the MOU,

did not include the loading of coal into such trucks; a practice existed for 18 to 20 months preceding the effective thereof of such work being performed exclusively by employees of the Employer, which was not affected by the MOU; and, therefore, the Employer violated the NBCWA's prohibition against contracting out work within its jurisdiction when it assigned such loading work to the employees of Transport.

Alternatively, the Union contended that, because Transport was, like the Employer, a Family (now Mechel) owned corporation, controlled and directed by Bluestone, they should be treated as a single employer for purposes of its jurisdiction under the NBCWA's and the application of its contracting out prohibition.

Arbitrator Rimmel denied the Union's first and second contentions for reasons that need not be discussed herein. On its third contention, he summarily concluded, "there is no evidence that the decision makers here [i.e., the Family members (now Mechel), who owned and controlled, through Bluestone, the Employer, Transport, Black Bear and Bluestone Sales] are in any way subject to the terms of the Dynamic/UMWA Agreement."

Since the Union presumably presented some evidence in support of its position (e.g., that the Employer, Transport and other component-corporations were all Family (now Mechel) owned corporations, interrelated components of its Coal Mountain enterprise and controlled through Bluestone) some evidence had to existed relevant and material to whether, at the component-corporations the Employer and Transport should be deemed a single employer for purposes of the Union's jurisdiction, as defined by Article IA (a) of the 2007 NBCWA. Thus, Arbitrator Rimmel's conclusion cannot be taken literally but construed as meaning he believed "insufficient" evidence existed in the record as a whole.

11

Also, the question in Arbitrator Rimmel's case was not, as he stated, whether the Family members, who owned the component-corporations of the Coal Mountain enterprise, should be treated as a single employer for such purpose; but whether Bluestone, the Employer, Transport and the other component-corporations should.

In contrast to the facts in Arbitrator Strongin's case, in Arbitrator Rimmel's, as in the instant case, the Employer and Transport were interlocking, co-dependent components of the Family's (now Mechel's) Coal Mountain enterprise, which is managed and directed by Family (now Mechel) owned, Bluestone. To such extent the factual situation and contractual issues in Arbitrator Rimmel's case are very much like those in this case, except in his case they involved whether the component-corporations, including the Employer and Transport, should be treated as a single employer; whereas in the instant case they involved whether the component-corporations, Employer and Black Bear, should be treated as such.

Due to this difference in the evidence before Arbitrator Rimmel was necessarily limited to that relevant and material to the relationship between the Family (now Mechel), Bluestone, Transport and the Employer with regard to the on-site transportation of the Employer' coal. Unlike in the instant case, there was no evidence before him regarding the relationship between the Family (now Mechel), Bluestone, the Employer, Black Bear [and its Family (now Mechel) owned contractors] regarding the processing of the Employer's coal

It is also important in terms of exceptions to the res judicata doctrine, discussed below, that Arbitrator Rimmel did not state which doctrine (the piercing-the-corporate veil or common or joint employer), if any, he relied upon in reaching his conclusion; discuss the record evidence relevant supporting his conclusion under whatever doctrine he may have utilized in reaching his conclusion; nor the Board's decision in ARB No. 56

12

(nor the panel arbitrators' decisions in *Eastern Consolidated Coal Corp.* or *Dakota Indus*, *supra*), that "realistic," not "artificial" considerations should be used to decide whether two or more family owned corporations are to be treated as a single employer for purposes of determining the scope of the Union's jurisdiction under Article IA (a) of the NBCWA. Consequently, the factual and legal bases for his conclusion are simply indiscernible from his written decision

Turning to the relevant and material facts in this case, the genesis of the Grievance (and of the grievances in the two arbitration decisions discussed above) goes back to 2004. In that year, the Family decided to engage in the enterprise, among others, of extracting raw coal from a surface mine near Coal Mountain, West Virginia, processing such coal and selling and shipping the processed coal to customers (herein before and after "Coal Mountain enterprise").

For the foregoing reasons, it decided to use separate, Family (now Mechel) owned corporations to operate each component of such enterprise; specifically, Bluestone to manage and direct it, the Employer to extract the raw coal, Black Bear to process it, and Bluestone Sales to sell the processed coal to customers. As discussed above in connection with Arbitrator Rimmel's case, after the 2007 MOU's provision allowing the Employer to contract out the transportation of coal became effective, it added, Transport, another Family (now Mechel) owned corporation as a component-corporation to haul the raw coal from the pit to the processing area.

It is beyond cavil, based on the testimony of Marcum and Lusk in this case, as well the findings of by Arbitrator Strongin in his award, based on the testimony of the Employer's witnesses therein, that Lusk, as COO of Bluestone, also serves as the *de facto* COO of each of the Family (now Michel) owned and operated Coal Mountain enterprise and each of its

13

component-corporations (i.e., Employer, Transport, Black Bear and Bluestone Sales).

And, in the Employer's case, Lusk also serves as its *de facto* General Manager. During the six years from the inception of operations at the Coal Mountain surface mine in 2004 to the present, the Employer has never had its own General Manager. Its highest ranking manager has been a Mine Superintendant. As Marcum testified, his responsibility, as Mine Superintendent (like that of his predecessor) is limited to following the directions of Lusk, at Bluestone, as to how much and what type of coal to extract; how it should be processed; whether employees of the Employer or those provided by Black Bear, through Family (now Mechel) owned contractor corporations, such as M&P and Justice High Wall, are to perform the processing work; and where to ship the processed coal. In view such testimony, it is apparent why the Employer has never needed to employ a General Manager of its own.

Although the Employer has attempted to portray all of the Family (now Mechel) owned corporations reporting to Bluestone as independent, permanent on-going businesses, there is no evidence in the record that, except for Bluestone, the component-corporations of the Coal Mountain enterprise, or the former Bluestone Coal and Redfox enterprises, are anything but shell corporations without equipment, managers or employees, except when taken off the self and provided with such at the time the Family (now Mechel) decides to use a combination of them as the components of an active mining enterprise.

For reasons not clear from the evidence in the record, in 2004 the Family, through Bluestone and Lusk, decided to recognize the Union as the exclusive bargaining agent for the employees of the Employer and entered in the 2003 NBCWA, as modified by the 2004 MOU (which relieved it of certain obligations under the NBCWA, including, without limitation, participation in the Union's defined benefit pension plan).

14

According to the testimony of Lusk, under the initial plan for the Coal Mountain enterprise, the Family, or Bluestone acting on its behalf, concluded it needed a preparation plant at the mine site to process the raw coal extracted by the Employer; it preferred the Employer  not operate the plant, because, if it were to become a signatory (as it eventually did) to the NBCWA,  it employees working at the plant would be entitled to the generous compensation, benefits, seniority rights and other terms and conditions provided under such Agreement; and to avoid that consequence,  the Family, or Bluestone acting on its behalf, decided  the operation of the preparation plant should be performed by one of the  its non-signatory corporations that could staff it with lower compensated non-union employees.

According to Marcum's testimony, the Family, or Bluestone on its behalf,  used its non-signatory corporation, NRI, to construct the preparation plant; upon completion, the Family leased the plant to NRI; which subleased it to another non-signatory, Family corporation; which, in turn, contracted out the operation of the plant to Black Bear, which the Arbitrator has found to be another non-signatory Family (now Mechel) owned corporation.

By installing Family (now Mechel) owned Black Bear as the operator of its preparation plant, the Family, or Bluestone on its behalf, believed it achieved its goal of having one of its non-signatory corporations process the coal mined by the Employer. For some reason, also not apparent from the evidence in the record (perhaps related to the quality of raw coal being mined by the Employer or the type of coal being ordered by customers) the preparation plant has not been used for such processing to date.

When the Family, or Bluestone on its behalf, decided not to use the preparation plant, the processing of the raw coal was assigned to classified employees of the Employer, covered by the NBCWA; rather than to

15

employees of Black Bear's contractors [also Family (now Mechel) owned, non–signatory corporations]. The Union contends that, until Marcum became Mine Superintendant in late January 2010, the processing of the Employer's coal had, from the onset of mining at the Coal Mountain surface mine been performed exclusively by employees of the Employer. The Employer contends that for that entire time it a mixture of employees of Black Bear's non-signatory contractor corporations, such as M&P and Justice high Wall, and it's (the Employer's) employees has performed such work.

Shortly after Marcum became Mine Superintendant, employee, Gary Stewart, while working in the processing area, observed a person performing work at or around the large stockpile, who was not an employee of the Employer. Because he believed the processing work was within the exclusive jurisdiction of the Union under Article IA (a) of the NBCWA, which prohibits contracting out work within its jurisdiction (with certain exceptions not applicable here), he reported the incident to Local Union Representative, Ben Clary.

Clary sought an explanation from Marcum, who responded the Employer added an employee of a non-signatory, Family (now Mechel) owned corporation (e.g., M&P or Justice High Wall) to the processing crew, because trucks were lined up waiting to be loaded with processed coal. A few days later, Marcum informed Clary the Employer had received a special order that required the raw coal to be crushed to a specified size and it intended to use employees of such a contractor corporation to perform that task. There is no evidence in the record, and the Employer does not contend, that employees of the Employer were unavailable to perform such work.

Clary protested that such processing work was within the Union's jurisdiction, as defined in Article IA (a) of the NBCWA, and contracting it out, rather than using its employees to perform it, violates such

16

Agreement's prohibition against contracting out. Marcum responded the processing of the coal mined by the Employer has never been performed exclusively by its employees, but has always been performed by a mixture of its employees and employees of such Family (now Mechel) owned contractor corporations; and, as a result of such lengthy "mixed practice," the processing work has never within the exclusive jurisdiction of the Union under Article lA (a).

It is strange that Marcum, and the Employer's advocate, rely so heavily on such mixed practice contention, as it is only relevant and material, if the Employer and Black Bear are deemed a single employer - a position the Employer adamantly rejects, as evidenced by its reliance on the prior awards of Arbitrators Strongin and Rimmel are *res judicata* on such issue. The Arbitrator can only view the Employer's serious effort to disprove employees of the Employer perform such work exclusively from the onset of mining oat the Coal Mountain surface mine, as intended to be supportive of an alternative position in the event the Arbitrator should agree with the Union's single employer position.

In any event, Clary disagreed with Marcum's position, contending employees of such contractor corporations had never before been used to process coal mined by the Employer. According to the testimony of several of the Union's witnesses, who worked in the processing area during certain periods from 2004 to the date of the hearing, such contractor employees were never used to process coal mine by the Employer; but, before Frontier shut down its deep mine, employees of contractor corporations had been used to screen its (Frontier's) coal.

Marcum testified that continuously from the onset of mining at the Coal Mountain site in 2004, a few contractor employees performed processing work, together with employees of the Employer; as coal production increased and customers started ordering more types, blends and sizes of coal, requiring more screening, crushing and stockpiling, such

17

work was not being performed as fast as raw coal was being deliver from the pit; the Employer complained to Black Bear that it was not fulfilling its contractual obligation to process all of its coal; and, in response, Black Bear started providing additional employees to perform such work, through subcontracts with other Family (now Michel) owned non-signatory corporations, such as M&P and Justice High Wall.

Marcum did not testify to when such new demands for processing the Employer's coal and the increased use of employees from Black Bear's contractor corporations to meet it, occurred. If after he became Mine Superintendant on January 25, 2010, it is irrelevant and immaterial as to which practice was in existence at the time the Grievance was filed only seven days later, on February 2, 2010. If before he arrived at the Coal Mountain surface mine, his testimony could not be based on his personal knowledge, but the personal knowledge of his predecessor as Mine Superintendant, except as to the seven day period between his arrival and February 2, 2010. Clearly, seven days, or less, is an insufficient period to establish the existence of any practice.

The person with personal knowledge of which practice existed before January 25, 2010 is Marcum's predecessor as Mine Superintendant. The Employer offered no explanation for not calling him to give direct, non-hearsay testimony on such issue, and to counter Clary's testimony that, when Marcum's predecessor was Mine Superintendant, he had agreed with the Union, that, under the NBCWA, the processing of the Employer's coal is within the exclusive jurisdiction of the Union, can only be performed by employees of the Employer and cannot be contracted out.

It is reasonably to infer from the Employer's unexplained failure to call the former Mine Superintendant that, had he been called, his testimony would not have supported its contention that the mixed practice described by Martin has existed from onset of mining at the Coal Mountain surface mine.

18

The Union's witnesses, who worked in the processing area prior to the filing of the Grievance testified they never observed a person, other than one employed by the Employer, processing coal mined by the Employer, until after Marcum became the Mine Superintendant on January 25, 2010. However, each testified he was only in the processing area during the shifts and days he was scheduled to work there. It follows their testimony, individually or combined, does not exclude the possibility employees of such contactor corporations performed processing work during the times none of them were present in the area.

If employees of the Family's (now Michel's) non-signatory corporations, such as R&P and Justice High Wall, in fact, regularly performed processing work on the Employer's coal from 2004 through February 2, 2010, as the Employer contends and Marcum represented in his hearsay testimony, the Employer offered no explanation for not calling one or more of such employees to testify to that fact, introducing corporate records of Black Bear documenting it contracted processing work out to other Family (now Mechel) owned corporations, if any, or the payroll records of such contractor corporations (e.g., M&B and Justice High Wall), if any, to document their employees performance of such work.

In the absence of an explanation for not presenting such rebuttal evidence, it is reasonable to infer that, had the Employer called such witnesses or introduced such documents (if they ever existed) neither would not have supported its mixed practice contention.

The only non-hearsay testimony presented by the Employer on the mixed practice issue was that of Steele. He testified that, for a number of years before the Grievance was filed, he regularly visited the processing area to calculate estimates of the tons of coal in the stockpiles; and, on one or more of those occasions, observed employees, other than employees of the Employer, working at or around the stockpiles.

19

The Arbitrator finds such testimony to be of questionable reliability due to the inherent difficulty of indentifying accurately an employee operating a piece of heavy equipment at or around an outdoor stockpile, dressed in ordinary work cloths (there is no evidence such employees wore uniforms indentifying their employers), wearing a hard hat and safety goggles, as an employee such a contractor corporation or an employee of the Employer ( and to have done so would require to know, personally, all of the employees of the Employer assigned to perform such work); and, because as a non-union employee, Steele is subject to discharge or other adverse employment action by the Employer, without cause, he had a strong interest in giving testimony supportive of the Employer's position.

Steele also testified that, sometime after Marcum became the new Mine Superintendant on January 25, 2010, he was assigned the additional duty ( highly unusual for a non- supervisory, Field Engineer) of assigning employees of Black Bear's contractor corporations, such as M&B and Justice High Wall, and employees of the Employer to process the Employer's coal; and, in carrying out such new found duty, consistently assigned such work to a mixture of employees of such contractor corporations and employees of the Employer.

The Arbitrator also finds this testimony by Steele to be of questionable reliability in view of the incongruity of a non-supervisory employee of the Employer directing such contractor corporations in the assignment of their employees to perform such work (unless such contractor corporations and the Employer are a single employer, as contended by the Union); and, again, because of his strong interest, discussed above, in supporting the Employer's position on the issue.

Moreover, such testimony has little, if any, relevance or materiality to issue at hand. The Grievance complains of a person, not employed by the Employer, performing processing work at the large stockpile on or about

20

February 2, 2010. Steele testified he was delegated this additional duty shortly after Marcum came on board, or sometime after January 25, 2010. Thus, except for seven days between January 25, 2010 and February 2, 2010, Steele's testimony relates to assigning a mixture of such employees to processing the Employer's coal, after the Grievance was filed and the violation complained of therein committed.

The relevant and material question in deciding the Grievance is not whether the alleged mixed practice after February 2, 2010; it is whether it existed between the onsets of mining coal at the Coal Mountain surface mine in 2004 until that date. To the extent Steele may have assigned employees of contactor corporations , such as M&P and Justice High Wall, to perform processing work on Employer mined coal during such seven, or less days,  such period is far too short to prove the existence of any practice.

Notwithstanding the record contains only hearsay testimony of the Union's  witnesses to support its position that before Marcum became Mine Superintendant in late January 2010, the processing of Employer mined coal was performed exclusively by employees of the Employer,  and only hearsay and unreliable testimony of the Employer's witnesses   to support its contention such work has always been performed by a mixture of employees of Black Bear's contractor corporations and employees of the Employer, the Arbitrator is able to conclude, based on the adverse inferences discussed above, that prior to January 25, 2010, the processing of raw coal extracted from the Coal Mountain surface mine was performed exclusively by its employees of the Employer, and to the extent  processing work was ever performed at the site by employees of such contractor corporations, such as M&P and Justice High Wall, before such date, it was not of coal mined by the Employer, but of coal mined by Frontier at its deep mine, before it the Family discontinued that operation.

## ISSUES

21

The parties did not stipulate to the issues raised by the Grievance. Based on the evidence in the record as a whole and the contentions of the parties, the Arbitrator finds them to be:

1. Whether by using one or more persons employed by a contractor corporation to process raw coal extracted from the Coal Mountain surface mine, on or about February 2, 2010, the Employer or Black Bear violated the prohibition against contracting out work within the exclusive jurisdiction of the Union contained in the 2007 NBCWA?

2. If so, the appropriate remedy?

## POSITIONS OF THE PARTIES

### UNION'S POSITION.

The Union's position is straight forward; Article IA, Section (a)   of NBCWA defines the work covered by the Agreement as including the "preparation, processing and cleaning" of coal and "work of the type customarily related" thereto; employees of the Employer have performed such work exclusively since the Coal Mountain surface mine first opened in 2004; the contracting out of  the work described in subsection (a), is prohibited, unless it falls within one of the exemptions to such prohibition provided in Section(g); there is no exemption in that subsection for work involving the "preparation, processing and cleaning" of coal; by its own admission the Employer has contracted out such work to Black Bear which, in turn, has contracted it out to other Family (now Mechel) owned non-signatory corporations, including on or about February 2, 2010; it follows the Employer has violated such prohibition.

22

Implicit in the Union's position (and in the Employer's contentions to the contrary and that the prior awards of Arbitrators Strongin and Rimmel are *res judicata*) is that the component-corporations of the Coal Mountain enterprise constitute a single employer; that being so, the 2007 NBCWA, to which the Employer is a signatory, is binding on all of such corporations, including, without limitation, on the Employer and Black Bear; and, therefore, Black Bear's contracting out the processing of the Employer's coal, including to contractor corporations, such as Family (now Mechel) owned M&P and Justice High Wall, violates the contracting out prohibition of such Agreement.

## EMPOYERS POSITION

The Employer counters with the position that, in 2004 or earlier, the Family decided to structure the Coal Mountain enterprise, using separate Family owned, non-signatory corporations   to perform each of its components (i.e.; mining processing and selling), so, in the event any of the component-corporations were to become a signatory to the NBCWA, the employees of the remaining non-signatory component-corporations would not be covered by such Agreement; the Family decided to use   the Employer to perform the mining component Black Bear, or its predecessor in interest, to perform the processing and stockpiling component and Bluestone Sales to perform the sales component; and Bluestone to manage and direct the enterprise, including each of its component-corporations. At the direction of the Family, or Bluestone on its behalf, the Employer entered into a contract with Black Bear, or its predecessor in interest, to process the coal it mined from the Coal Mountain pit.

Shortly thereafter, the Employer became a signatory to the 2003 NBCWA by executing the 2004 MOU. Because the Employer entered into to the agreement with Black Bear, or its predecessor in interest before the Employer became a signatory to such Agreement, the prohibition therein

23

against contracting out work within the Union's jurisdiction does not apply thereto.

The Employer contends the Union cannot avoid such result by contending Bluestone, the Employer, Black Bear and Bluestone Sales are a single employer, because, as it reads their awards, Arbitrator Strongin in his 2009 case and Arbitrator Rimmel in his 2008 case have already ruled that each of the Family's (now Mechel's) corporations must be treated as separate and distinct entities and the NBCWA entered into by one can have no application to the other, non-signatory corporations; and, under the doctrine of *res judicata*, recognized by the Board, as applicable to arbitrations conducted under the NBCWA, both decisions are binding on the Arbitrator in this case.

Alternatively, the Employer argues that, even if the Arbitrator were to decide the component- corporations of the Coal Mountain enterprise must be treated be as a single employer for purposes of the 2007 NBCWA, employees of the Employer did not performed such work exclusively from the onset of mining at the Coal Mountain surface mine; rather, a practice has existed from that time of using a mixture of employees of Black Bear's contractor corporations, such as Family (now Mechel) owned corporations M&P and Justice High Wall, and employees of the Employer, to process its coal; and, under Article I of the NBCWA, the execution of such Agreement cannot change the existing "practices...pertaining to management....as heretofore practiced and understood;" and, therefore, the continuation of such "mixed practice" is not a violation of such Agreement's contacting out prohibition.

## DECISION

Since this is not a disciplinary case, the ultimate burden of proof and persuasion rests with the Union. It must prove, by a preponderance of the evidence in the record as a whole, the Employer violated the 2007 NBCWA,

24

when on or about February 2, 2010, it assigned a person, other than one of its employees to performed processing, including stockpiling, work at or around the large on-site stockpile. This is not an onerous burden, as the Union's evidence must only ever so slightly tip the scale in favor of its position. The Employer has the burden of proving, by a preponderance of the evidence in the record as a whole, any matter in the nature of an affirmative defense.

The Employer has not contested that it assigned an employee of a contractor of Black Bear to perform such work on or about February 2, 2010. Indeed, it has presented evidence to attempt to prove employees of such contractor corporations have regularly performed processing work, together with its employees, since the time the Coal Mountain surface mine first opened. Consequently, the Union's burden is limited to proving the performance of such processing work by an employee of such a contractor corporation violated the contracting out provision of the 2007 NBCWA.

To accomplish that objective, the Union must prove by a preponderance of the evidence in the record as a whole, including the testimony and other evidence presented by the Employer, that Black Bear is not a separate, stand alone corporation, but is part of single employer covered by the terms and conditions of the 2007 NBCWA.

The Arbitrator must evaluate and weigh all such evidence in determining whether the Union carried such burden. By the same token, the Arbitrator must evaluate and weigh all of the record evidence in determining whether the Employer carried its burden of proving any affirmative defense to the Union's claim.

Because the Article IA (a) expressly provides it has jurisdiction over the "preparation, processing and cleaning" of coal, and such work is not exempted, by any provision of Section (g), from the prohibition against

25

contracting out, and the Employer admitted that on or about February 2, 2010 it used an employee of a Black Bear contractor corporation to perform such work, the Union established a *prima facie* case that the Employer or Black Bear violated such prohibition. As a result, the burden of going forward shifted to the Employer to present evidence which, if believed, would overcome, or constitute a valid defense to, the Union's case.

In this regard the Employer presented evidence, un-rebutted by the Union, that prior to opening the mine in 2004, the Family decided to use the Employer, which was then a non-signatory to the NBCWA, to extract the raw coal from the Coal Mountain surface mine and to use another of its non-signatory corporations to operate the preparation plant; and this was accomplished by the Employer entering into an agreement with Black Bear, or its predecessor in interest, to operate the plant to process it's coal. Hence, the Employer's position is, because such contracting out agreement was entered into before it became a signatory to the NBCWA, it was not subject to the NBCWA's prohibition against contracting out work within the Union's exclusive jurisdiction.

Since the Employer carried it burden of going forward by presenting such evidence, the burden returned to the Union to prove by a preponderance of the evidence in the record as a whole (including the evidence presented by the Employer through the testimony of its witnesses and documentary exhibits, that the component-corporations of the Coal Mountain enterprise, including the Employer and Black Bear, must be treated as a single employer and, as such covered by the 2007 NBCWA, to which the Employer is a signatory; and, therefore, the Employer or black Bear violated the prohibition against contracting out work within its exclusive jurisdiction.

The Arbitrator concludes on the evidence in the record as a whole and the finding based thereon discussed above, the Union has carried such

26

burden and proved, under the common or joint employer doctrine, the Family (now Mechel) owned component-corporations of the Coal Mountain mining enterprise (i.e., Bluestone, the Employer, Black Bear and Bluestone Sales) function as a single employer for the purpose of the application of the terms and conditions of the 2007 NBCWA to which the Employer is a signatory; and, therefore, it or Black Bear violated the contracting out prohibition of such Agreement, when on or about February 2, 2010, one or more employees of contractor corporation, were used to process the Employer's coal.

The Arbitrator reasoned that, based on the Board's decision in ARB No. 56, and to a lesser extent on the decisions of the panel arbitrators in *Eastern Associated Coal Corp.* and *Rufus Indus.*, discussed above, eschewing an "artificial," test, founded upon corporate formalities, in favor of a test, premised on "realistic" employment-related considerations, for deciding when two or more family owned corporations should be treated as a single employer for purposes of the application of the terms and conditions of the NBCWA, that the common or joint employer doctrine should be applied in the instant case, rather than the piercing-the-corporate-veil doctrine, utilized by Arbitrator Strongin in his.

The common or joint employer doctrine applies solely to determining whether two or more commonly owned or controlled corporate entities should be treated as if they are a single entity for purposes of applying employment statutes and contracts, including collective bargaining agreements. It is far more suitable for application in this case than the piercing- the-corporate-veil doctrine, as it requires consideration of realistic, employment-related factors, rather than artificial factors, such as the component- corporations' maintenance of corporate formalities, separate officers and directors, books, accounting records or tax returns considered under the piercing-the-corporate-veil doctrine, in determining whether the component-corporations of the Family's (now Michel's) Coal Mountain enterprise (including, without limitation, the

27

Employer and Black Bear) should be treated as a single employer for purposes of determining the extent of the Union's exclusive jurisdiction under Article IA (a) of the 2007 NBCWA, to which the Employer is a signatory.

The common or joint employer doctrine looks to the extent of interrelatedness and co-dependency of the work performed by the employees of the Family (now Michel) owned corporations comprising the components of the Coal Mountain enterprise, the frequency of interchange or commonality of managers, employees, and the equipment they operate and, most important, the degree of common control exercised by the Family (now Michel), through Bluestone and Lusk, over matters directly or indirectly affecting employment matters within such enterprise.

When such indices of common or joint employment are applied to the foregoing findings of fact, based on the evidence in the record as a whole, it is clear the component-corporations of the Coal Mountain enterprise, including, without limitation, the Employer and Black Bear, function, and should be treated, for purposes of deciding the Grievance, as a single employer. Such findings include, but are not limited to:

- All component-corporations of the Coal Mountain enterprise have from its onset been owned by and subject to the direct or indirect control of the Family (now Michel), through Bluestone and its COO, Lusk;

- Black Bear, the Family (now Michel) owned corporation, controlled and directed by Bluestone, to which the Employer contracted out the processing of its coal, before becoming a signatory to 2003 NBCWA, has never had managers or a workforce its own to physically process the Employer's coal.

28

- To the extent it has carried out its contractual obligation to do so, it has been on an "as needed" basis, through subcontracting such processing to other Family (now Michel) owned, non-signatory corporations, such as M&P and Justice High Wall, at the direct or indirect (through the Employer's Mine Superintendant) command of Bluestone, through Lusk.

- Such Family (now Michel) owned, contractor corporations do not have, or do not use, their own equipment to perform such processing on the occasions they are called upon to perform such processing but use equipment provided by the Employer;

- The work performed by each component corporation of the Coal Mountain enterprise (Bluestone, the Employer, Black Bear and Black Bear Sales) is not only related, it is interlocked and co-dependent. No component corporation can perform its task, and such enterprise cannot function, unless each of the other component corporations performs it's.

- Because Lusk, as COO of Bluestone also serves as he *de facto* COO of each of such co-dependent, component corporations including, without limitation, the Employer and Black Bear, the management of each such corporation and   of the Coal Mountain enterprise as a whole, are  inextricably intertwined

- The Employer has never had a General Manager of its own, because Lusk, as COO of Bluestone, has always served as such, *de facto*; in such capacity he has directed the Employer's Mine Superintendant regarding how much coal to mine, how and by whom it is to be processed and where the processed coal is to

29

be shipped; and, because Black Bear is only a paper corporation, without managers or employees, Lusk, as its *de facto* COO, necessarily decides to which Family (now Michel) owned, contractor corporation(s) the processing of the Employer's coal is to be subcontracted.

- The only purpose of the Family, or Bluestone on its behalf, through Lusk, in structuring of the Coal Mountain enterprise to use separate non-signatory corporations for each of its components, is to maximize the probability that, if any component-corporation were to become a signatory to the NBCWA, as the Employer eventually did, the employees of the others would not be covered by its terms and conditions.

- For some six years, from the opening of the Coal Mountain pit in 2004 until on or about February 2, 2010 (or perhaps as early January 25, 2010, when Marcum became Mine Superintendant), the processing of the coal mined at the Coal Mountain surface mine was performed exclusively by the classified employees of the Employer; since then, a portion of such work has been performed, including on February 2, 2010, as complained of in the Grievance, by one or more employees of Family (now Michel) owned, non-signatory contractor corporations, including M&P and Justice High Wall, at the direction Lusk, as its *de facto* COO.

- Bluestone, through Lusk, as *de facto* General Manager of the Employer and *de facto* COO of Black Bear has treated the two corporations (as well the Family, now Michel, owned corporations to which Black Bear has from January 25, 2010, subcontracted a portion of such processing work), for all practical (i.e., realistic) purposes no differently than if they

30

were a single corporation performing both the mining and processing components of the Coal Mountain enterprise.

• Bluestone, through Lusk, controls directly or indirectly all, or virtually all, material aspects of the operations of the component-corporations of the Coal Mountain enterprise, such as the Employer and Black Bear (and even of Black Bear's contractor corporations) including, without limitation, matters related to the wages, benefits, shifts and hours worked of employees of non-signatory, component corporations; and, for signatory corporations, certain of the terms and conditions of the NBCWA, a modified by MOUs.

Notwithstanding the Arbitrator's conclusion that, in his opinion, the component- corporations of the Coal Mountain enterprise, including the employer and Black Bear, are a common or joint employer for the purpose of the Union's jurisdiction under Article IA (a) of the 2007 NBCWA, the issue remains whether he may enter an award base on that opinion or is bound by the doctrine of *res judicator* to honor the prior awards of Arbitrators Strong in and Rommel , cited by the Employer for the proposition that each of the Family (now Michel) owned corporations must be treated as separate for such purpose.

The Employer is correct that the Board's decision in *The North American Coal Corp.*, and its progeny, make the doctrine of *res judicator* applicable to arbitration awards rendered under the NBCWA. In that case the Board held:

> ...where the same parties are involved in a dispute on the *same Issues* which have been decided in a prior case between those Parties, a subsequent arbitrator generally will abide by the prior Award even though he may not have made the same award had

31

He heard the prior case. (Emphasis added).

The Board went further, however, and described the following exceptional situations in which an arbitrator may "feel compelled to refuse to apply a prior award to a particular case:"

> (1) The previous award was clearly an instance of bad judgment;
> (2) The decision was made without benefit of some important and Relevant facts;
> (3) The decision was based on an obvious and substantial error of Fact or law;
> (4) A full and fair hearing was not afforded in the prior case.

*Westmoreland Coal Co.* (West 1991), cited by the Employer, makes clear the application of *res judicator* does not turn only on the issues in the prior case being the same but also on the facts being the same:

> For the situation where there has been prior decision on a dispute between the same parties, on the *same contractual issues*, and on the *same set of facts*-the same cause of action-the principle of *res judicata* is applied to make the prior decision authoritative as dispositive of a subsequent case between the parties on the same issue and *set of facts*.... (Emphasis added).

It follows that whether the doctrine of res judicata applies in any case, including the instant case, requires a three step analysis:

1. Are the issues the same as in the prior case?

2. Are the facts the same as in the prior case?

3. If the issues and the facts are the same as in the prior case, do any of the four exceptions, discussed above, permit the Arbitrator to

32

> decline giving res judicata effect the prior
> case?

To be fair to the Employer, the Arbitrator is aware of other Board and panel arbitrator decisions dealing with *res judicata*, which stand for the proposition that the facts in the prior case do not have to be identical to those in the instant case. All that is required is the factual situation is fundamentally the same. If it were otherwise, there would be few, if any, instances in which the doctrine would apply.

After carefully applying the first two of the above requirements to Arbitrator Strongin's award, the Arbitrator concludes it is not *res judicata* in the instant case, because neither the factual situation nor the issues in his case are the same as here.

The contractual issue in Arbitrator Strongin's case was whether the employees of component- corporations of the Coal Mountain enterprise, the Bluestone Coal enterprise and the Redfox enterprise had panel rights under Article 17 (h) of the 2007 NBCWA, because the Employer and Bluestone Coal (but not any of the others) were signatories to such Agreement NBWCA; whereas in the instant case the contractual issue is only whether the Union's jurisdiction under the Agreement with the Employer extends to the component- corporations of the Coal Mountain enterprise.

Nor was the factual situation in Arbitrator Strongin's case the same as that in the instant case. The relevant and material facts in his case involved the horizontal relationship between the mining components of three different enterprises; whereas the relevant and material facts in this case involved the vertical relationship between the component corporations of a single enterprise. It follows Arbitrator Strongin's factual findings and analysis did not involve the Family's (now Mechels) common ownership and control, through Bluestone (Lusk), of the Employer, Black

33

Bear (or of its Family owned and controlled subcontractors, M&P and Justice High Wall); but focused on whether the extent of the Family' common ownership and control, through Bluestone (Lusk) of the three enterprises was sufficient to render them a common or joint employer under the NBCWA.

Even if it is assumed for, purposes of argument, that Arbitrator Strongin's case involved the same issues and factual situation as in the instant case, in the Arbitrator's is of the opinion it falls within the substantial-error- of-law exception to the *res judicata* doctrine, because his application of the piercing-the-corporate-veil doctrine to determine whether two or more family owned corporations should be treated as separate or joint employers for purposes of determining the extent of the Union's jurisdiction under the NBCWA was contrary to the Board's decision in ARB No. 56 that panel arbitrators should decide such issues based on realistic factors (e.g. whether, in practice, they function as if they were a single employer) and not on artificial factors (e.g., whether each corporation maintains formalities required to protect shareholders from personal liability for its debts and obligations ).

Between two doctrines, one of which, like the common or joint employer doctrine, is used specifically in deciding whether such corporations should be treated as one for the purpose of applying an employment contract, such as a collective bargaining agreement, and one that is not, no rational basis exists for using the latter

On the surface, the contractual issue in Arbitrator Rimmel's case of whether the Bluestone, Transport and Employer components of the Coal Mountain enterprise should be treated as a single employer, for panel right purposes, more closely resembles the issue in the instant case. As in so many instances the truth lies in the details.

34

Upon closer review, it becomes clear the sub-issues are not. Arbitrator Rimmel was confronted with the issue of whether, at least, the Employer and Transport should be treated as a single employer for the purpose of determining whether the loading of off-highway trucks hauling coal from the pit to the processing area was within the Union's exclusive jurisdiction; whereas in the instant case, the Arbitrator is faced with the contractual issue of whether, at least, the Employer and Black Bear should be treated as such for the purpose of deciding whether the processing of the delivered coal is within such jurisdiction.

As a result of that difference, the factual situations in Arbitrator Rimmel's varied greatly from that in the instant case. The factual situation in his case involved the provision of the 2007 MOU allowing the Employer to contract out the internal transportation of its coal; a contract with non-signatory, Transport, to load and haul raw coal from the pit to the processing area; the prior practice of employees of the Employer loading such coal, and transporting from the pit it to the MacDonald Fork stockpile; whereas the factual situation in the instant case does not any of the foregoing, but is limited what happens after Transport delivers the raw coal to the processing area including, without limitation, the Employer's purported contracting out agreement with Black Bear, the crushing, cleaning, screening, blending and stockpiling the coal by employees of the Family (now Mechel) owned corporation to which Black Bear subcontracted a portion of such processing, such a R&P and Justice High Wall, and the shipping of the finished coal to customers

Because Arbitrator Rimmel's case did not involve the same contractual issues or contractual issues or factual situation as exist in the in the instant case, his award does not meet the first, two requirement of the *res judicata* doctrine; and, therefore, is not binding on the Arbitrator in the instant case. Furthermore, even if Arbitrator Rimmel award is assumed, *arguendo,* to meet such requirements; the Arbitrator concludes it falls

35

within two of the exceptions to the doctrine the application of the doctrine, discussed above.

First, because Arbitrator Rimmel does not discuss the evidence in the record as a whole, which he found insufficient to prove the Family owned component-corporations of the Blue Mountain enterprise, including the Employer and Transport, all controlled by Bluestone, through Lusk, should not be treated as a single entity for the purpose of determining the Union's exclusive jurisdiction under Article IA (a), it cannot be determine whether he made his decision "without the benefit of some important relevant facts."

Second, because Arbitrator Rimmel failed to identify the legal principle, if any, he relied upon in summarily concluding such component-corporation, including the Employer and Black Bear, although all controlled by Bluestone, through Lusk, should not be treated as a single employer for such purpose (i.e., the piercing-the-corporate-veil doctrine, as Arbitrator Strongin did in his case, or the common or joint employer, like the Arbitrator has in this case or any at all, it cannot be determined whether his decision was "based upon an obvious and substantial error of law or fact."

The final issue raised by the Employer alternative position that, even if each of the component-corporations of the Coal Mountain enterprise, including Bluestone, the Employer Black Bear, are deemed a single employer for purposes of determining the extent of the Union's exclusive jurisdiction under Article IA (a) of the 2007 NBCWA, a mixed practice has existed from the onset of mining at the pit in 2004 of using a mix of employees of Black Bear's Family (now Mechel) owned non-signatory, contractor corporations and its own employees in processing the coal and the Employer's execution of such NBCWA cannot its change such practice because Article IA (a) thereof defines such jurisdiction as including,

36

"...preparation, processing and cleaning of coal...performed at the mine..., and work of the type customarily related to [it]."

The short answer to such contention is the Arbitrator has found, for the reasons discussed above, that such mixed practice did not exist, until after Marcum became the Mine Superintendant, only only seven days before the date of the violation alleged in the Grievance, and for the period of six or so years from the onset of mining at the Coal Mountain surface mine until Marcum arrive on January 25, 2010, all of the processing of the Employer's coal was performed exclusively by its classified employees.

For the reasons discussed above, the Arbitrator concludes the Union proved, based on a preponderance of the evidence in the record as a whole, including the testimony and exhibits presented by the Employer, that Bluestone, the Employer, Black Bear and Bluestone Sales, as interrelated and commonly owned and directed components of the Mechel's Coal Mountain enterprise, including, but not limited, to the Employer and Black Bear, must be treated as if they constituted a single employer for the purpose of the Union's exclusive jurisdiction, as defined by Article IA (a) of 2007 NBCWA, to which the Employer is a signatory; such jurisdiction expressly includes the "preparation, processing and cleaning" the Employer's coal; using one or more contractor corporations including, without limitation, those owned by the Family (now Mechel), such R&P and Justice High Wall, is contrary to the contracting out prohibition of such Agreement and by doing so, on or about February 2, 2010, as complained of in the Grievance, the Employer violated such provision..

## REMEDY

For the reasons discussed above, the Arbitrator declares that Bluestone, the Employer, Black Bear and Bluestone Sales, as interrelated, commonly controlled components of Mechel's Coal Mountain enterprise, constitute common or joint employer for purposes of applying the terms

37

and conditions of the 2007 NBCWA, to which the Employer is a signatory. To remedy the foregoing violation of such Agreement, the Employer shall cease and desist from having its coal processed by any contractor corporation including, without limitation, any such corporation owned by Mechel owned corporation, such as R&P and Justice High Wall; and the Employer shall immediately compensate any employee, who lost work as a result of the February 2, 2010, violation complained of in the Grievance

### AWARD

For the foregoing reasons, the Grievance is hereby GRANTED; and the Arbitrator enters the following award:

1. The Mechel owned corporations, Bluestone, the Employer Black Bear and Bluestone Sales, as components corporations of the Coal Mountain enterprise, are a common or joint employer for purposes of the Union's exclusive jurisdiction, as defined by Article IA (a) of the 2007 NBCWA between the Union and the Employer; and each such component-corporation is bound by the terms and conditions thereof including, without limitation, it prohibition against contacting out work within such jurisdiction.

2. Bluestone, the Employer and Black Bear, as integral parts of such common or joint employer, shall immediately cease and desist from contracting out the processing of coal, mined by the Employer from the Coal Mountain surface mine, to any contractor corporation or other entity including, without limitation, any such corporation or entity owned by Mechel.

38

3. The Employer, Black Bear or both shall immediately compensate (i.e., wages and benefits) any classified employee for work time lost due to contracting out the processing of coal mined by the Employer to one or more contractor corporations on or about February 2, 2010, in violation of the contracting out prohibition of the 2007 NBCWA, as complained of in the Grievance.

4. Any claims or defenses not specifically addressed herein are DENIED

ENTERED this 27th day of June 2010, by

S/Lynn E. Wagner
Lynn E. Wagner
Arbitrator

39